**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LAN R. WALTERS,** | : | **CIVIL ACTION NO. 1:05-CV-1745** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN E. POTTER, Postmaster** | : | |
| **General, U.S. Postal Service** | : | |
| | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

This is an employment discrimination action filed by Lan R. Walters

("Walters"), a former participant in the United States Postal Service Associate

Supervisor Program.  The defendant, John E. Potter, is the Postmaster General for

the United States Postal Service ("Postal Service").  In his complaint, Walters

alleges that the Postal Service:  (1) discriminated against him on the basis of gender

and disability, and (2) retaliated against him for filing a complaint with the Equal

Employment Opportunity Commission ("EEOC").  Presently before the court is

defendant's motion for summary judgment (Doc. 15).  For the reasons that follow,

the motion will be granted.

**I.    <u>Statement of Facts</u>**[1]

In 1997, Walters began working for the Postal Service as a distribution clerk.

(Doc. 17 ¶¶ 9-10; Doc. 23 ¶¶ 9-10.)  In 1999, Walters applied for the Associate

---

[1] In accordance with the standard of review for a motion for summary
judgment, the court will present the facts in the light most favorable to Walters.
<u>See</u> <u>infra</u> Part II.

Supervisor Program ("Program"), which is "an intense 16 week curriculum of classroom learning, homework, tests, and on-the-job training" designed to prepare Postal Service employees to become supervisors.  (Doc. 17 ¶¶ 32-33; Doc. 23 ¶¶ 32-33.)  Walters' application was rejected.[2]  Thereafter, Walters participated in precomplaint counseling sessions with the EEOC in which he alleged that his application for the 1999 Program had been rejected because of disability and gender discrimination.[3]  (Doc. 17 ¶¶ 45, 47; Doc. 17 ¶¶ 45, 47.)  In settlement of these claims, defendant agreed to accept Walters into a subsequent Program.  (Doc. 17 ¶ 49; Doc. 23 ¶ 49.)

In 2001, Walters was one of seventeen individuals selected to participate in the Program.  (Doc. 17 ¶¶ 51-52; Doc. 23 ¶¶ 51-52.)  Of these seventeen individuals, thirteen, including Walters, received their training at defendant's Harrisburg facility.  (Doc. 17 ¶ 51; Doc. 23 ¶ 51.)  The four remaining individuals received their classroom training in Harrisburg, but completed their on-the-job training and

---

[2] The Program's selection committee determined that Walters was "unsuitable" for the 1999 Program.  (Doc. 24, Ex. 2 at 76-77.)  This determination was based, in large part, upon a letter submitted by one of Walters' supervisors, William Keim ("Keim").  In the letter, Keim stated that Walters' "performance has deteriorated" and that his "outbursts have increased."  (Doc. 17, Ex. P at 7-8.)  Keim also requested that Walters not be admitted into the Program "until he can prove that he can work with his peers, get along with others and not cause problems on the workroom floor."  (Id.)

[3] Walters alleged that the following Postal Service employees were responsible for the discrimination:  (1) Michael C. Bifalco, (2) Keim, and (3) Donald Keane ("Keane").  (Doc. 17 ¶¶ 46, 48; Doc. 23 ¶¶ 46, 48.)

evaluations at other Postal Service facilities in Pennsylvania.  (Doc. 17 ¶ 52; Doc. 23 ¶ 52.)

## A.    <u>Weeks One and Two of the Program</u>

The first two weeks of the Associate Supervisor Program consist entirely of classroom instruction, followed by a written examination to determine whether a candidate should be permitted to continue in the Program.  (Doc. 17 ¶¶ 34-35; Doc. 23 ¶¶ 34-35.)  In the instant case, all seventeen participants, including Walters, met as a group for classroom instruction.  (Doc. 17 ¶ 63; Doc. 23 ¶ 63.)  Walters passed his written examination and was permitted to remain in the Program. (Doc. 17 ¶ 75; Doc. 23 ¶ 75.)

At the end of the second week, the thirteen participants in the Harrisburg facility were broken into two groups to make it easier for them "to hear and understand".  (Doc. 17 ¶ 55; Doc. 23 ¶ 55.)  Because each group was to work a different shift, the participants were asked for their shift preferences before the group assignments were made.  (Doc. 17 ¶ 56; Doc. 23 ¶ 58.)  Walters was assigned the shift he had requested.  (Doc. 17 ¶ 60; Doc. 23 ¶ 60.)  The groups were comprised as follows:

Group A                          Group B

Lan Walters (male)               Rob Wicks (male)
Michael Battle (male)            Frank Thompson (male)
George Daugherty (male)          Rodney Rowe (male)
Daron Depto (male)               David Thomas (male)
Patrick King (male)              John Smith (male)
Terry Burns (male)               Joan Chatmon (female)
                                 Jayme Garner (female)

(Doc. 17 ¶ 62; Doc. 23 ¶ 62.)

Thereafter, Faye Griggs ("Griggs"), who was the classroom instructor during

the first two weeks of the Program, repeatedly referred to Walters' all-male group

as the "testosterone group."  (Doc. 17 ¶¶ 69-70; Doc. 23 ¶¶ 69-70.)  Walters also

alleges that Griggs made an offensive comment to one of Walters' group members,

Terry Burns ("Burns").  After a dialogue between Griggs and Burns regarding

Burns' attire, Griggs said, "Oh, your wife dresses you."  (Doc. 17 ¶¶ 66-67; Doc. 23

¶¶ 66-67.)

## B.   Weeks Three through Eight of the Program

In weeks three through eight of the Program, classroom instruction is

supplemented with on-the-job training and homework assignments.  (Doc. 17 ¶ 36;

Doc. 23 ¶ 36.)  Candidates also receive weekly evaluation scores ranging from zero

to four.[4]  (Doc. 17 ¶ 37; Doc. 23 ¶ 37.)  In the instant case, Troy Seanor ("Seanor")

provided classroom instruction and prepared evaluations for week three of the

---

[4] The evaluations contain ten sub-parts on which each candidate is graded,
and the scores for each sub-part are then averaged to arrive at the overall score.
(Doc. 17 ¶¶ 39-40; Doc. 23 ¶¶ 39-40.)

Program.  (Doc. 17 ¶ 76; Doc. 23 ¶ 76.)  Seanor gave all of the participants an

evaluation score of 2.  (Doc. 17 ¶ 78; Doc. 23 ¶ 78.)  From weeks four through six,

Carrol Cannon ("Cannon"), Joanne Smith ("Smith"), and Barbara Murray

("Murray") provided instruction.[5]  (Doc. 17 ¶¶ 79, 86; Doc. 23 ¶¶ 79, 86.)  Despite the

fact that she was not an instructor, Griggs prepared the evaluations for weeks four

through six.  Griggs elicited input from Cannon and Keim but not from Smith or

Murray.[6]  (Doc. 17 ¶ 87; Doc. 23 ¶ 87.)  Griggs decided that "no one at that point was

an expert in any part of that process of the [P]rogram," so she did not award any

evaluation scores of 4.  (Doc. 17 ¶¶ 91-92; Doc. 23 ¶¶ 91-92.)

Murray continued to provide instruction during weeks seven and eight.

(Doc. 17 ¶ 95; Doc. 23 ¶ 95.)  Murray also prepared the evaluations for those two

weeks.  Cannon told Murray that Walters "was only in the program because of an

EEO complaint, and that he was a troublemaker."[7]  (Doc. 24, Ex. 1 at 67.)  Cannon

also instructed Murray that no one should receive a score of four, so Murray

---

[5] During weeks 4 and 5, Cannon instructed Group A, while Smith instructed Group B.  The instructors switched groups for week 6.  During week 6, Smith began to have difficulties with her voice, so she was replaced with Murray.  (Doc. 17 ¶¶ 81-83, 86; Doc. 23 ¶¶ 81-83, 86.)

[6] Griggs stated that she did not consult with Smith because Smith was having problems with her voice.  (Doc. 17 ¶ 88; Doc. 23 ¶ 88.)  Moreover, although Smith had taught the Program in previous years, she had never filled out evaluation forms.  (Doc. 17 ¶ 90; Doc. 23 ¶ 90.)  Griggs also stated that she "talked about" the participants with Keim, but that he did not take an active role in preparing the evaluations.  (Doc. 24 at 25.)

[7] Walters alleges that Cannon made this statement at Griggs' direction and that it was Griggs who initially labeled him a "troublemaker."  (Doc. 24-4 at 101.)

awarded scores ranging from 3.4 to 3.9 for weeks seven and eight.  (Doc. 17 ¶¶ 96-97; Doc. 23 ¶¶ 96-97.)  Murray awarded Walters scores of 3.6 and 3.65 for weeks seven and eight, respectively.  (Doc. 17 ¶ 97; Doc. 23 ¶ 97.)  Averaging these scores with Walters' prior weekly scores of 2.0, 2.3, 2.0, and 2.2 resulted in Walters' final evaluation score of 2.6. (Doc. 17, Ex. D at 2-9.)

### C.   Week Eight Examination

After the eighth week, candidates must take a second written examination, which is scored from zero to four.[8]  (Doc. 17 ¶ 41; Doc. 23 ¶ 41.)  Each candidate's test score is then added to his or her average weekly evaluation score to arrive at a combined score.  (Doc. 12 ¶ 43; Doc. 23 ¶ 43.)  A candidate must receive a combined score of five or higher to continue in the Program.  (Doc. 17 ¶ 44; Doc. 23 ¶ 44.)

In total, seven of the thirteen Harrisburg participants successfully completed the Program in 2001.[9]  Walters was not among them.  (Doc. 17 ¶ 112; Doc. 23 ¶ 112.)  Walters was asked to leave the Program because he received a score of 2 on his final examination, for a combined score of 4.6.  (Doc. 17 ¶¶ 109, 111; Doc. 23 ¶¶ 109, 111.)

Believing that his final examination score had been calculated incorrectly, Walters requested permission to review his examination.  His request was refused

---

[8]  The examination is scored by the National Testing Administration Center ("NTAC"), and is proctored by a Postal Service employee.  (Doc. 17 ¶ 42; Doc. 23 ¶ 42.)  In the instant case, that employee was Richard Corrado ("Corrado").  (Doc. 17 ¶ 103.)  After administering the examination, Corrado had sole custody of the test papers, which he sent to the NTAC facility to be scored.  (Doc. 17 ¶ 105.)

[9]  Of the seven successful participants, two were from Walters' group (Group A) and five were male.

because the Postal Service destroys the examinations in the "ordinary course of business" and considers the examination questions to be "trade secrets."  (Doc. 23 ¶ 76; Doc. 17 ¶¶ 95, 117, 121.)

**D.**   **Alleged Program Irregularities**

Walters asserts that there were numerous irregularities in the Program's administration and that these irregularities were prompted by a discriminatory animus.  (Doc. 24 at 11.)  The alleged irregularities are as follows:

1.   The evaluations for weeks four through six were completed after the sixth week, rather than once weekly as required by the Program. Walters says this reduced his ability to improve between evaluations. (Doc. 17 ¶ 93; Doc. 23 ¶¶ 93-94; Doc. 24 at 19.)
2.   Griggs and Cannon decided that none of the candidates in Harrisburg deserved an evaluation score of four.  (Doc. 17 ¶¶ 91-92; Doc. 23 ¶¶ 91-92; Doc. 24 at 25-28.)
3.   Griggs conducted evaluations when she was neither an on-site trainer nor a classroom instructor, as required by the Program.  (Doc. 17 ¶ 87; Doc. 23 ¶ 87; Doc. 24 at 22-24.)  When preparing these evaluations, Griggs consulted with Cannon and Keim but not Smith or Murray. (Doc. 24 at 20.)
4.   The candidates were taught using Harrisburg-specific materials that were not required by the Program.  (Doc. 17 ¶¶ 64-65; Doc. 23 ¶¶ 64-65; Doc. 24 at 29-30.)
5.   Cannon and Smith were not qualified in the areas they were required to teach.  (Doc. 24-4 at 258, 262; Doc. 24 at 28-30.)
6.   The candidates were instructed that the week eight examination was pass/fail.  (Doc. 24 at 30.)
7.   Seanor gave all candidates an evaluation score of 2 for week three. (Doc. 17 ¶ 76; Doc. 23 ¶ 76.)
8.   The candidates were divided into two groups, although such a division was not required by the Program.  (Doc. 24 at 12, 19.)  The groups were assigned different work shifts and study hours.  (Doc. 24-4 at 152.)
9.   The candidates were not permitted to review their examinations to determine if they had been "improperly graded" or " altered." (Doc. 24 at 31-33.)

Walters acknowledges that these irregularities applied equally to all thirteen Harrisburg candidates.  (Doc. 17 ¶¶ 62, 65, 78, 81, 87, 92-93; Doc. 23 ¶¶ 62, 65, 78, 81, 87, 92-93; Doc. 24 at 25, 31-33; Doc. 24-4 at 156.)  However, Walters maintains that all thirteen candidates were discriminated against because they were "caught in the vortex of retaliatory conduct principally directed at Mr. Walters."  (Doc. 24 at 11 n.1; see also Doc. 24-4 at 187; Doc. 17 ¶ 122; Doc. 23 ¶ 122.)

### E.   Walters' Disability

Walters alleges that, at the time of the 2001 Program, he was suffering from both physical and mental disabilities that resulted from his prior military service.[10] (Doc. 24-4 at 43, 63-64.)  Walters' physical disabilities include back and knee conditions which prevent him from doing anything "that's repetitive or requires a length of time to do."  (Doc. 17 ¶¶ 4, 6; Doc. 23 ¶¶ 4, 6.)  Specifically, Walters testified that he cannot:  (1) lift his "kids for more than five or ten minutes," (2) "do yard work all day," (3) jog, or (4) "lift repetitively . . . for an eight-hour day."  (Doc. 17, Ex. J at 25.)  However, Walters admits that he has "no problem walking."  (Doc. 17 ¶ 8; Doc. 23 ¶ 8.)  In addition, Walters testified that he was able to do the lifting required for his employment with the Postal Service by managing the amount of weight in each mail container and that he never formally sought accommodation for his disability from the Postal Service.  (Doc. 17 ¶ 14; Doc. 23 ¶ 14; Doc. 24-4 at 107.)

---

[10]  The Veteran's Administration apparently rates Walters as 60% disabled based upon a combination of physical and mental disorders.  (Doc. 17 ¶ 1; Doc. 23 ¶ 1.)

8

At the time that Walters was participating in the 2001 Program, he was also able to assist with the construction of a home for "a few hours a day." (Doc. 17 ¶ 16; Doc. 23 ¶ 16.)

Walters characterizes his mental disability as posttraumatic stress disorder ("PTSD").[11] He says that his disability prevents him from getting "uninterrupted sleep" and that he has been prescribed sleeping pills as a result. (Doc. 17 ¶¶ 2, 5; Doc. 23 ¶¶ 2, 5; Doc. 24-4 at 68-69.) Walters also believes he is easily "aggravated and flustered" and has "anger issues" because of his posttraumatic stress disorder. (Doc. 24-4 at 70-71; Doc. 17 ¶ 27; Doc. 23 ¶ 27.)

Walters is not certain whether anyone affiliated with the 2001 Program knew about his alleged physical and mental disabilities, and Walters admits that he did not tell anyone affiliated with the Program about his disabilities. (Doc. 17 ¶¶ 25-26; Doc. 23 ¶¶ 25-26.) However, he alleges that the 2001 Program supervisors could have learned about his disabilities by accessing his personnel file or by researching his prior EEOC complaint. (Doc. 24-4 at 94, 97, 99, 138.) According to Walters, Keim knew about Walters' disabilities because Keim was a "central character" in Walters' prior EEOC claim. (Doc. 17 ¶ 131; Doc. 23 ¶ 131.) Furthermore, Walters alleges that Griggs and Cannon were aware of his disabilities because they made

---

[11]   The Veteran's Administration characterizes Walters' mental disability as neurosis and dysthymic disorder. (Doc. 17 ¶ 1; Doc. 23 ¶ 1.) In 2002, a staff psychiatrist for the Veteran's Administration expressed "a serious question whether PTSD underlies [Walters'] depression," but did not make a definitive PTSD diagnosis. (Doc. 17, Ex. N at 5.) In 2004, Walters underwent a screening for PTSD, but the screening was negative. (Doc. 17 ¶ 18; Doc. 23 ¶ 18.)

9

comments to Murray regarding his EEOC complaint.  (Doc. 24, Ex. 1 at 67; Doc. 24-4 at 101; Doc. 17 ¶ 132; Doc. 23 ¶ 132.)

## F.    Procedural History

Walters filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), and the Administrative Law Judge ruled in favor of defendant.  (Doc. 17 ¶ 133; Doc. 23 ¶ 133.)  On August 26, 2005, Walters filed the instant action pursuant Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e-2(a), 2000e-3(a), and the Rehabilitation Act, 29 U.S.C. § 701.  (See Doc. 1.) Specifically, Walters contends that defendant discriminated against him on the basis of gender and disability and that defendant retaliated against him for filing a complaint with the EEOC.[12]  (See Doc. 1.)  Defendant filed the instant motion for summary judgment (Doc. 15), alleging that Walters has failed to establish a *prima facie* case of discrimination.  The motion has been fully briefed and is ripe for disposition.

## II.    Standard of Review

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact," and for which a jury trial would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(c).  It places the burden on the non-moving party to come forth with "affirmative evidence,

---

[12]  Specifically, Walters alleges that:  (1) Griggs and Cannon discriminated against him on the basis of gender, (2) Griggs, Cannon, and Seanor discriminated against him on the basis of disability, and (3) Griggs, Cannon, Seanor, and Keim retaliated against him.  (Doc. 17 ¶¶ 124-127, 130; Doc. 23 ¶¶ 124-127, 130.)

beyond the allegations of the pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

## III.   Discussion

Walters alleges that defendant discriminated against him on the basis of gender and disability.  Walters also alleges that defendant retaliated against him for filing a complaint with the EEOC.  The court will address these claims *seriatim.*

## A.   **Gender Discrimination**

Walters alleges that he was subjected to disparate treatment in training,

evaluation and testing because of his gender.[13]  To withstand a motion for summary

judgment on a disparate treatment claim, a plaintiff must establish that his or her

"protected trait played a role in the employer's decision-making process and had a

determinative influence on the outcome of that process."  Ulitchney v. Potter, No.

3:04CV991, 2006 WL 1722391, at *2 (M.D. Pa. 2006) (quoting Monaco v. Amer. Gen.

Assurance. Co., 359 F.3d 296, 300 (3d Cir. 2004)).  A plaintiff may meet this burden

with either direct evidence, see Price Waterhouse v. Hopkins, 490 U.S. 288 (1989)

(O'Connor, J., concurring), or circumstantial evidence, see McDonnell Douglas

Corp. v. Green, 411 U.S. 792, 802 (1973).  In the instant case, Walters has not

---

[13]  Gender discrimination is proscribed by Title VII, which provides, in
pertinent part, as follows:

It shall be an unlawful employment practice for an employer --

(1)  to fail or refuse to hire or to discharge any individual, or otherwise to
discriminate against any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such individual's race,
color, religion, *sex*, or national origin; or

(2)  to limit, segregate, or classify his employees or applicants for employment
in any way which would deprive or tend to deprive any individual of
employment opportunities or otherwise adversely affect his status as an
employee, because of such individual's race, color, religion, *sex*, or national
origin.

42 U.S.C. § 2000-e(2) (emphasis added).

provided direct evidence of discrimination;[14] therefore, the court will examine his

claims using the three step burden-shifting analysis set forth in McDonnell Douglas.

Under McDonnell Douglas, a plaintiff must first establish a *prima facie* case

of discrimination by proving the following elements:  (1) the plaintiff is a member of

a protected class,[15] (2) the plaintiff was qualified for the position he held or sought,

(3) the plaintiff suffered an adverse employment action, and (4) the circumstances of

the adverse employment action give rise to an inference of discrimination.  Johnson

v. Keebler-Sunshine Biscuits, Inc., No. 06-3219, 2007 WL 215801, at *2 (3d Cir. 2007);

Connors v. Chrysler Fin. Corp., 160 F.3d 971, 974 (3d Cir. 1998).  Once the *prima*

*facie* case is established, the burden shifts to the defendant to articulate some

---

[14]  Direct evidence is "evidence that proves an ultimate fact in the case
without any process of inference."  Woodson v. Scott Paper Co., 109 F.3d 913, 930
(3d. Cir. 1997).  An employer who discriminates "will almost never announce a
discriminatory animus or provide employees or courts with direct evidence of
discriminatory intent."  Iadimarco v. Runyon, 190 F.3d 151, 157 (3d Cir. 1999).
Therefore, a plaintiff who wishes to establish a *prima facie* case of discrimination
using direct evidence "faces a high hurdle."  Connors v. Chrysler Fin. Corp., 160
F.3d 971, 976 (3d Cir. 1998).  The court has found no evidence of record to suggest
that Walters has cleared this hurdle in the instant action.  At most, Griggs'
derogatory statements evidence an awareness of Walters' gender.  The statements
do not suggest that defendant's employment decisions were based upon Walters'
gender.  Contrast Salkovitz v. Pioneer Elecs., Inc., 188 F. App'x 90, 93 (3d Cir. 2006)
(holding that referring to employee as a "human antique" was insufficient to
constitute direct evidence of discrimination), with Fakete v. Aetna, Inc., 308 F.3d
335, 336 (3d Cir. 2002) (holding that being told that the defendant was "looking for
younger single people" was sufficient to constitute direct evidence of
discrimination).

[15]  The protected class element has been extended to reach cases of "reverse
discrimination," wherein a member of a majority group alleges that he or she was
discriminated against in favor of a member of a minority group.  Iadimarco, 190
F.3d at 158.  Walters' claim of gender discrimination falls into this category.

"legitimate, nondiscriminatory reason" for the plaintiff's treatment.  Iadimarco v.

Runyon, 190 F.3d 151, 157 (3d Cir. 1999) (citing McDonnell Douglas, 411 U.S. at 802);

Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997).  The

defendant's burden to prove a legitimate non-discriminatory reason is "relatively

light."  Johnson, 2007 WL 215801, at *3.  The defendant is only required to prove

that its actions could have been motivated by the proffered legitimate,

nondiscriminatory reason; proof of actual causation is not required.  Iadimarco, 190

F.3d at 157.  Once the defendant has met its burden, the plaintiff must "prove by a

preponderance of the evidence that the legitimate reasons offered by the defendant

are merely a pretext for discrimination."  Johnson, 2007 WL 215801, at *2.  The

plaintiff may meet this burden by presenting evidence from which a reasonable

factfinder could "either (1) disbelieve the employer's articulated legitimate reasons;

or (2) believe that an invidious discriminatory reason was more likely than not a

motivating or determinative cause of the employer's action." Keller, 130 F.3d at

1108.

Turning to the *prima facie* case, defendant concedes that Walters was a

member of a protected class and that he suffered an adverse employment action.

However, defendant contends that Walters was not qualified for the position

because he did not receive the required combined score of five.  See Straining v.

AT&T Wireless Servs., Inc., 144 F. App'x 229, 232 (3d Cir. 2005) (holding that job

applicant who did not earn passing scores on required examination was not

"qualified" for the position).  Walters counters that he would have received the

14

required combined score absent the disparate treatment he was subjected to because of his gender.  Given Walters' argument that his score was depressed because of discrimination, the court cannot find as a matter of law that Walters was not qualified for the position.

Next, the court must determine whether the circumstances of Walters' termination give rise to an inference of discrimination.  A plaintiff can establish an inference of discrimination where he or she was "treated differently than similarly-situated, non-protected employees."  Johnson, 2007 WL 215801, at *2.  Similarly-situated employees are those who "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002); see also Red v. Potter, No. 05-5256, 2006 WL 3349563, at *2 (3d Cir. 2006) (stating that "in order to show that an employee is 'similarly situated,' all of the relevant aspects of employment need to be nearly identical).  In the action *sub judice*, the thirteen candidates who were trained in Harrisburg are similarly-situated.[16]

---

[16]  The court finds sufficient "differentiating or mitigating circumstances" to distinguish the four candidates who trained outside Harrisburg from Walters.  For example, the four additional candidates conducted their on-site training in different locations and were evaluated by different supervisors than Walters.  See Ogden, 226 F. Supp. at 603.  In addition, these four additional candidates were trained in customer service, while Walters was trained in distribution operations.  (Doc. 24-4 at 142-43.)

To establish an inference of gender discrimination, Walters relies upon: (1) his assignment to an all-male group, (2) Griggs' statement regarding Burns' clothing, and (3) Griggs' references to the "testosterone group." The court finds that these allegations fail to establish an inference of gender discrimination. Walters concedes that he chose his group assignment based upon his desired work schedule. Additionally, Griggs' statements, at most, amount to "the sporadic use of abusive language [and] gender-related jokes" that fall short of the threshold of actionability under Title VII. <u>Kay v. Independence Blue Cross</u>, 142 F. App'x 48, 51 (3d Cir. 2005). While Griggs' references to the "testosterone group" and to Burns' clothing may have been in poor taste, they do not evidence a general intent to discriminate against men. <u>See</u> <u>Miller v. Berry Metal Co.</u>, 80 F. App'x 245, 248 (3d Cir. 2003) (finding that comments that were "likely made in jest" do not give rise to an inference of discrimination); <u>Verney v. Dorado</u>, 872 F. Supp. 188, 197 (M.D. Pa. 1995) (holding that "continual references to a woman's breasts" reflected poor judgment but did not prove discrimination); <u>Yon v. SEPTA</u>, No. Civ. A. 01-5231, 2003 WL 22597614, at *16 (E.D. Pa. 2003) (finding that "passing references to PMS and hormones . . . do not create an inference of gender discrimination).

Walters also points to a number of "irregularities" in the training, evaluation and testing process which he says evidenced a discriminatory intent. <u>See</u> <u>supra</u> Part I.D. However, Walters has failed to allege that he was "treated differently than similarly-situated, non-protected employees" with respect to these irregularities. <u>See</u> <u>Johnson</u>, 2007 WL 215801, at *2. Even viewing the evidence in the light most

16

favorable to Walters, the court finds that all similarly-situated candidates were

subjected to the same materials, evaluations, score calculations, and examinations.

While Group A occasionally received different treatment than Group B, the court

finds that these differences were *de minimis*.  There is ample evidence that all

examinations were scored by a neutral third-party, and Walters has not produced

any evidence that defendant's employees had the motive or opportunity to alter his

test results.  Likewise, all participants who did not achieve a combined score of five

were dismissed from the Program irrespective of gender.

For the foregoing reasons, the court finds insufficient evidence to establish

an inference of discrimination on the basis of gender.  Because Walters has failed to

establish a *prima facie* case of discrimination, defendant's motion for summary

judgment will be granted.[17]

---

[17] Assuming *arguendo* that Walters had established a *prima facie* case of
discrimination, his claim would still fail for lack of evidence of pretext.  Defendant
has produced sufficient evidence that Walters was terminated for the legitimate
non-discriminatory reason that he did not achieve the requisite score to proceed in
the Program.  Proving pretext places a "difficult burden" on the plaintiff.
Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 386 (3d Cir. 1999).  The plaintiff
must show "not merely that the employer's proffered reason was wrong, but that it
was so plainly wrong that it cannot have been the employer's real reason."  Keller,
130 F.3d at 1009.  It is not for the court to second-guess defendant's decision to
adhere strictly to the Program's score requirement.  See Kautz v. Met-Pro Corp.,
412 F.3d 463, 471 (3d Cir. 2005) ("[T]he mere fact that a different, perhaps better,
method of evaluation could have been used is not evidence of pretext."); Ezold v.
Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 528 (3d Cir. 1992) (noting that the
court does not act as "member[] of an employer's promotion board or committee").
Walters has presented no evidence to suggest that defendant's adherence to the
score requirement was motivated by discriminatory animus.  Absent such evidence,
Walters cannot meet his burden to prove pretext.

### B.   **Disability Discrimination**[18]

Walters claims that defendant violated the Rehabilitation Act by

discriminating against him on the basis of his mental and physical disabilities.

The Rehabilitation Act provides, in pertinent part, as follows:

> No otherwise qualified individual with a disability . . . shall, solely by
> reason of her or his disability, be excluded from the participation in, be
> denied the benefits of, or be subjected to discrimination under any
> program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a).  To prove a violation of this section, a plaintiff must establish

that:  (1) the plaintiff "has a disability," (2) the plaintiff is "otherwise qualified to

perform the essential functions of the job," and (3) the plaintiff was "terminated or

otherwise prevented from performing the job."  Sever v. Henderson, 381 F. Supp.

2d 405, 413 (M.D. Pa. 2005).  The Rehabilitation Act defines "disability" as: (1) "a

physical or mental impairment that substantially limits one or more . . . major life

activities," (2) "a record of such an impairment," or (3) "being regarded as having

such an impairment."  Id.; see also 29 U.S.C. § 705(20)(B).  Defendant contends that

Walters has presented no evidence that he was disabled, had a record of a disability,

or was regarded as disabled at the time of the 2001 Program.  (See Doc. 16 at 2.)

---

[18] The court notes that the Rehabilitation Act provides that "the standards of
the [Americans with Disabilities Act] are to be used in determining whether the
Rehabilitation Act has been violated in the employment context."  Shultz v. Potter,
142 F. App'x 598, 599 (3d Cir. 2005).  The court has complied with this mandate
where appropriate.

1.   **Actual Disability**

To prevail on his claim of actual disability, Walters must prove that his alleged physical and mental impairments substantially limit his major life activities.[19]  See Sever, 381 F. Supp. 2d at 413.  Major life activities are "those activities that are of central importance to daily life."  Toyota Motor Mfg., Inc. v. Williams, 534 U.S. 184, 197 (2002).  Such activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  Spencer v. Verizon Connected Solutions, Inc., 138 F. App'x 449, 451 (3d Cir. 2005).  The key inquiry is "whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with [his or her] specific job."  Toyota, 534 U.S. at 200-01.  "[I]mpairments that interfere in only a minor way" with the performance of such tasks do not constitute a disability.  Id. at 197.

Walters alleges that his mental disability prevents him from getting "uninterrupted sleep."  (Doc. 17 ¶¶ 2, 5; Doc. 23 ¶¶ 2, 5.)  "Difficulty sleeping is a common problem, and not a limitation of a major life activity unless the plaintiff shows a uniquely severe affliction."  Sloan v. City of Pittsburgh, 110 F. App'x 207, 212 (3d Cir. 2004).  The court finds no evidence to suggest that Walters suffers from a severe affliction.  To the contrary, "corrective measures," such as medications,

---

[19]  Whether an individual is substantially limited in a major life activity is a question of fact.  Creasy v. Novelty, Inc., No. 04-CV-2296, 2005 WL 2787022, at *5 (M.D. Pa. 2005).

appear to have improved Walters' sleeping disorder.  (See Doc. 24-4 at 68-69);

Creasy v. Novelty, Inc., No. 04-CV-2296, 2005 WL 2787022, at *5 (M.D. Pa. 2005).

Walters further alleges that his physical disabilities prevent him from:

(1) lifting his "kids for more than five or ten minutes," (2) doing "yard work all day,"

(3) jogging, and (4) lifting "repetitively . . . for an eight-hour day."  (Doc. 17, Ex. J at

25.)  The court finds that an impairment of these activities fails to establish a

disability as a matter of law.  See Toyota, 122 S. Ct. at 694 (holding that being forced

to "reduce how often she plays with her children [and] gardens" did not constitute a

disability); Horth v. General Dynamics Land Systems, Inc., 960 F. Supp. 873, 879

(M.D. Pa. 1997) (finding that plaintiff's "alleged inability to lift twenty pounds

continually throughout an eight hour shift is not sufficient" to establish a disability).

While Walters alleges that his inability to lift affected his job performance as a

distribution clerk, even a complete "inability to perform a single job does not

warrant a finding that the plaintiff has a disability."  Id. at 878.  To establish that he

was disabled within the meaning of the Rehabilitation Act, Walters would be

required to prove that "an entire class or range of jobs has been foreclosed"

because of his impairment.  Id. at 878.  While the "inability to lift heavy objects may

eliminate certain specific jobs, such a restriction does not foreclose [a plaintiff's]

participation in an entire class of jobs or a broad range of jobs."  Id. at 879.

Accordingly, the court finds that Walters has failed to establish that he is disabled

as defined by the Rehabilitation Act.

### 2.   **Record of Disability**

To establish a record of impairment, Walters must demonstrate a history of a substantially limiting impairment or a misclassification as having a substantially limiting impairment.  29 C.F.R. § 1630.2(k).  Walters argues that his Veteran's Administration disability rating establishes a record of disability.  (See Doc. 17 ¶ 1; Doc. 23 ¶ 1.)  However, the fact that "an individual has a record of being a disabled veteran . . . does not guarantee that the individual" qualifies as disabled as defined by the Rehabilitation Act.  Howell v. Sam's Club N. 8160/Wal-Mart, 959 F. Supp. 260, 267 (E.D. Pa. 1997) (citing 29 C.F.R. § 1630.2(k)).  To meet this definition, the alleged record of impairment must explicitly "demonstrate a substantial limitation in major life activities."  Id. at 268; Taylor v. Phoenixville Sch. Dist., 113 F. Supp. 2d 770, 774 (E.D. Pa. 2000).  After a careful review of the record in the instant case, the court finds no documentation, from the Veteran's Administration or otherwise, which suggests that Walters is substantially limited in any major life activity.  Accordingly, Walters has not raised a genuine issue of material fact regarding the existence of a record of impairment.

### 3.   **Regarded as Disabled**

To establish that he was "regarded as" disabled, Walters must show that he: "(1) has a physical or mental impairment that does not substantially limit major life activities but is treated by the [defendant] as constituting such limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) has no such

impairment but is treated by a [defendant] as having a substantially limiting impairment."  Robinson v. Lockheed Martin Corp., No. 06-1704, 2007 WL 38345, at *3 (3d Cir. 2007).  In making this determination, the court must focus on "the reactions and perceptions of the persons interacting or working" with the plaintiff and not on the plaintiff's "actual abilities."  Howell, 959 F. Supp. at 268 (citing 29 C.F.R. § 1630.2(l)(1)).

In the action *sub judice*, Walters concedes that he did not make his disabilities known to his supervisors in the 2001 Program.  (Doc. 17 ¶¶ 25-26; Doc. 23 ¶¶ 25-26.)  However, he alleges that the supervisors *could* have learned about his disabilities by accessing his personnel file or by researching his prior EEOC complaint.  (Doc. 24-4 at 94, 97, 99, 138.)  Even assuming that Walters' supervisors learned of his alleged impairments, an employer's mere awareness of "an employee's impairment is insufficient to demonstrate . . . that the employer regarded the employee as disabled."  Sever v. Henderson, 381 F. Supp. 2d 405, 416 n.5 (M.D. Pa. 2005) (citing Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir. 1996)).  Instead, the employee must prove that the employer considered him to be "substantially limited in performing either a class of jobs of a broad range of jobs in various classes."  Howell, 959 F. Supp. at 269; Wilson v. MVM, Inc., 475 F.3d 166 (3d Cir. 2007).  Despite Walters' occasional inability to lift objects as required by his employment, defendant did not change Walters' job duties or take any other actions which could indicate that defendant regarded Walters as incapable of performing his job.  Howell, 959 F. Supp. at 270.  Furthermore, the court finds no evidence of

record to indicate that Walters' separation from the 2001 Program was based, in any way, upon a belief by defendant that Walters suffered from a mental or physical impairment.  See supra note 16 (discussing defendant's legitimate, non-discriminatory reason for terminating Walters from the program).

For the foregoing reasons, the court finds that Walters is unable to establish a *prima facie* case of disability discrimination, and defendant's summary judgment motion will be granted with regards to this claim.[20]

C.   **Retaliation**

An employer cannot "discriminate against an employee because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or a hearing under Title VII." Van Houton v. Principi, 106 F. App'x 134, 137 (3d Cir. 2004).  To state a *prima facie* claim of retaliation, a plaintiff must allege that:  (1) he or she engaged in protected activity, (2) the employer subjected him or her to an adverse employment action, and (3) "a causal link exists between the protected activity and the adverse action." Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001).  Defendant concedes that Walters' EEOC complaint was a protected activity and that Walters was subjected to an adverse employment action

_____

[20] Like claims of gender discrimination, claims of disability discrimination "are evaluated under the *McDonnell Douglas* burden-shifting paradigm." Speer v. Norfolk Southern Ry. Corp., 121 F. App'x 475, 476 (3d Cir. 2005).  Assuming *arguendo* that Walters had established a *prima facie* case of disability discrimination, his claim would still fail for lack of evidence of pretext. See supra note 16.

when he was excused from the 2001 Program.  Therefore, the court need only address the issue of causation.

To establish the causation element of a retaliation claim, a plaintiff must prove that his or her participation in a protected activity "played some substantial role" in motivating the adverse employment action.  <u>Meenan v. Harrison</u>, Civ. A. No. 3:03-CV-1300, 2006 WL 1000032, at *4 (M.D. Pa. Apr. 13, 2006).  If a plaintiff meets this burden, the defendant can rebut the claim of causation by showing that "the same adverse action would have taken place in the absence of the protected conduct."  <u>Chambers v. Pennsylvania</u>, Civ. A. No. 1:04-CV-0714, 2006 WL 3831377, at *7 (M.D. Pa. Dec. 28, 2006); <u>Baldassare v. New Jersey</u>, 250 F.3d 188, 194 (3d Cir. 2001).  The temporal proximity of an adverse action to a plaintiff's involvement in protected activity is probative of the causation element of a retaliation claim.  <u>Estate of Smith v. Marasco</u>, 318 F.3d 497, 512 (3d Cir. 2003).  However, a protected activity and an adverse employment action must be "very close" in time to prove causation.  <u>See</u> <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273-74 (2001) (holding that twenty month period between protected activity and adverse employment action did not suggest causation).  In the action *sub judice*, Walters' protected activity occurred in 1999, while his adverse employment action occurred in 2001.  <u>See</u> <u>Taylor v. Potter</u>, Nos. Civ. A. 02-1332, 02-1619, 03-1105, 2004 WL 1859782, at *4 (D. Del. 2004) (stating that, where two years had passed between the plaintiff's protected activity and his adverse employment action, "no reasonable factfinder

could conclude that there was a causal connection"). Therefore, temporal proximity alone cannot prove causation in the instant action.

As further support for his causation argument, Walters points to Griggs' and Cannon's statements that he was a "troublemaker." (See Doc. 24-4 at 101; Doc. 17 ¶¶ 96-97; Doc. 23 ¶¶ 96-97.) "Stray remarks by . . . decisionmakers unrelated to the decision process are rarely given great weight" in determining causation. Windfelder v. The May Dep't Stores Co., 93 F. App'x 351, 355 (3d Cir. 2004). In the action *sub judice*, the court finds that Griggs and Cannon were acting as decisionmakers because they evaluated the candidates for several weeks. However, Griggs' and Cannon's statements were at best stray remarks that did not evidence an intent to retaliate against Walters. See Ascolese v. Se. Pa. Transp. Auth., 925 F. Supp. 351, 364 (E.D. Pa. 1996) (holding that calling an employee a "troublemaker" was insufficient to establish the causation element of a retaliation claim).

Furthermore, defendant has produced sufficient evidence that Walters was terminated for the non-retaliatory reason that he did not achieve the requisite score to proceed in the 2001 Program. The court finds no evidence which would tend to demonstrate that defendant's asserted non-retaliatory reason for dismissing Walters from the Program was pretextual. See supra note 16. Accordingly, a reasonable jury could not conclude that Walters' dismissal from the Program was motivated by his protected speech, and the court will grant summary judgment in favor of defendant on Walters' retaliation claim.

25

IV.   **Conclusion**

For the foregoing reasons, the court will grant defendant's motion for

summary judgment, and this case will be closed.

An appropriate order will issue.


  S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:      March 5, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LAN R. WALTERS, | : | CIVIL ACTION NO. 1:05-CV-1745 |
| | : | |
| Plaintiff | : | (Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| JOHN E. POTTER, Postmaster | : | |
| General, U.S. Postal Service | : | |
| | : | |
| Defendant | : | |

## ORDER

AND NOW, this 5th day of March, 2007, upon consideration of the motion for

summary judgment (Doc. 15), and for the reasons set forth in the accompanying

memorandum, it is hereby ORDERED that:

1.  Defendant's motion for summary judgment (Doc. 15) is GRANTED.
    See FED. R. CIV. P. 56(c).

2.  The Clerk of Court is directed to enter JUDGMENT against plaintiff
    and in favor of defendant John E. Potter.

3.  The Clerk of Court is directed to CLOSE this case.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge